**Peter N. GEORGOPOLUS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 29S00–9803–CR–155.**

Supreme Court of Indiana.

Sept. 29, 2000.

Jennifer M. Lukemeyer, Symmes, Voyles, Zahn, Paul & Hogan, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

RUCKER, Justice.

After a trial by jury, Peter Georgopulos was convicted of murder in the stabbing death of a real estate agent. The trial court sentenced him to an enhanced term of sixty-five years imprisonment. In this direct appeal, Georgopulos raises two issues for our review which we rephrase as follows: (1) did the trial court err in refusing Georgopulos' tendered instruction concerning the consequences of a verdict of guilty but mentally ill; and (2) did the trial court err in sentencing Georgopulos by relying on improper aggravating factors and not giving proper weight to mitigating factors. Finding no error, we affirm.

### Facts

On June 30, 1996, a Hamilton County deputy sheriff received a report of blood on the floor of a model home. Upon investigation the deputy discovered the body of real estate agent Kimberly Schriner. A later autopsy revealed that Schriner suffered a skull fracture consistent with being struck with a rock. The autopsy also revealed that Schriner suffered fifty-five stab wounds that caused severe internal injury and ultimately her death. Later that day Georgopulos checked into a motel in Clarks Hill, Indiana. Early the following morning Georgopulos went to the front desk, told the clerk that he had committed a crime, and asked the clerk to call the police. Ultimately officers of the Fishers Police Department took Georgopulos into custody. In an audiotaped statement, Georgopulos admitted striking Schriner with a rock that he had picked up on his way into the model home. He also admitted stabbing Schriner with a knife he had brought with him for that purpose. Apparently Georgopulos was obsessed with Schriner, from whom he had purchased a house over a year earlier, and he was upset because she had originally agreed to go on a date with him but later canceled.

Georgopulos was charged with murder and notified the State that he intended to interpose the defense of insanity. As a result, Georgopulos was examined by three court appointed psychiatrists who concluded that he was not insane at the time of

the offense. In any event during *voir dire* both the defense and the State questioned prospective jurors at length concerning their views of the insanity defense. Some of the prospective jurors expressed skepticism of the defense referring to it as a "cop-out," a "loophole," and "a way to get a lesser plea." Ultimately the jury returned a verdict of guilty as charged. Thereafter the trial court sentenced Georgopolus to the maximum term of sixty-five years. This appeal followed. Additional facts are set forth below where relevant.

### Discussion

#### I.

■ Georgopulos tendered the following final jury instruction: "A finding of guilty but mentally ill is of no consequence whatsoever. The effect is in all things the same as a finding of guilty." R. at 178. The trial court refused the instruction, and Georgopulos contends it erred in so doing because the instruction represented a correct statement of the law, there was evidence in the record to support giving the instruction, and the substance of the tendered instruction was not covered by other instructions. *See Hartman v. State,* 669 N.E.2d 959, 960–61 (Ind.1996). Georgopulos cites *Stader v. State,* 453 N.E.2d 1032 (Ind.Ct.App.1983), for the proposition that where the verdict options before a jury include not guilty by reason of insanity or guilty but mentally ill, an instruction on the consequences of these verdicts "becomes mandatory in cases where an erroneous view of the applicable law becomes implanted in the minds of the jurors." *Id.* at 1036.

■ First, we disagree with Georgopulos' contention that his tendered jury instruction represents a correct statement of the law. The language used in the instruction is taken from this Court's opinion in *Truman v. State,* 481 N.E.2d 1089 (Ind.1985).[1] However, "[t]he mere fact that certain language or expressions are used in the opinions of this Court to reach its final conclusion does not necessarily make it proper language for instructions to a jury." *Morgan v. State,* 544 N.E.2d 143, 148 (Ind.1989). Contrary to the language in Georgopulos' tendered instruction, there are indeed consequences to a jury verdict of guilty but mentally ill that are different from a verdict of guilty. It is true that whenever a defendant is found guilty but mentally ill at the time of the crime, the court shall sentence the defendant in the same manner as a defendant found guilty of the offense. *See* Ind.Code § 35–36–2–5(a). However, a physician must evaluate the guilty but mentally ill defendant before the trial court may sentence him. *See* Ind.Code § 35–36–2–5(b). Also, at the Department of Correction, the guilty but mentally ill defendant must be further evaluated and treated as is psychiatrically indicated for his mental illness. *See* Ind. Code § 35–36–2–5(c). Neither of these additional procedures is available to a defendant who is found simply guilty of an offense. Because Georgopulos' tendered instruction is not a correct statement of the law, the trial court did not err in refusing to give it.

■ Further, we do not agree with the underlying premise of the need for the proposed tendered instruction, namely: that an erroneous view of the law had been planted in the jurors' minds. Generally, it is improper to instruct a jury on the specific penal ramifications of its verdicts. *Schweitzer v. State,* 552 N.E.2d 454, 457 (Ind.1990). However, a defendant is entitled to an instruction on post-trial procedures if "an erroneous view of the law ... has been planted in [the jurors'] minds." *Dipert v. State,* 259 Ind. 260, 262, 286 N.E.2d 405, 407 (1972). In *Dipert* during *voir dire* a prospective juror asked the prosecutor what would happen to the defendant if he were found not guilty by reason of insanity. The prosecutor re-

---

1. The exact quote says "[i]t is of no consequence whatever that the jury or a judge finds a person mentally ill at the same time they find him to be guilty." *Truman,* 481 N.E.2d at 1090.

sponded that the defendant would go "scot free." *Id.*, 286 N.E.2d at 406. The trial court refused to admonish the jury to disregard the remarks or to give an instruction concerning the post-trial proceedings involved in a verdict of not guilty by reason of insanity. On appeal this Court declared that normally a defendant who interposes a defense of not guilty by reason of insanity is not entitled to an instruction concerning post-trial procedures. However, a defendant is "entitled to inform the jury of such procedures where an erroneous view of the law on this subject has been planted in their minds." *Id.*, 286 N.E.2d at 407. Recently, in *Caldwell v. State*, 722 N.E.2d 814 (Ind.2000), the defendant tendered two instructions detailing the consequences of the verdicts guilty but mentally ill and not responsible by reason of insanity. The trial court refused the instructions, and the defendant objected. In the State's rebuttal to the defendant's closing argument, the prosecutor made the following comment:

> Don't by your verdict and [sic] tell us that he's not responsible, don't tell us that he has a license to kill. Don't let him walk out of this courtroom with the rest of us when this case is over with, don't let him get away with murder. Don't let him get away with murder.

*Id.* at 816. The defendant again objected and requested that the rejected instructions or an admonishment be given to the jury to eliminate any confusion that the prosecutor's comments may have engendered in the jury. The trial court overruled the defendant's objection and again refused to give the requested instructions or an admonishment. *Id.*

Observing that the prosecutor's comments were not as misleading as the statements in *Dipert*, we determined that these statements nonetheless implied that the defendant would be able to walk out of the courtroom if he were found not responsible by reason of insanity. *Id.* at 817. As such, the prosecutor's closing remarks created in the jury an erroneous impression of law, namely: what would happen to the defendant if he were found not responsible by reason of insanity. *Id.* Accordingly, we found reversible error in the trial court's failure to either admonish the jury or give the defendant's tendered instructions. *Id.*

■ Unlike the facts in either *Dipert* or *Caldwell*, here the prosecutor did not implant an erroneous view of the law in the minds of the jury. Indeed, the record shows whenever a prospective juror asked the prosecutor during *voir dire* whether Indiana had any guidelines regarding the penal consequences concerning a verdict of not responsible by reason of insanity, the prosecutor responded that there are dispositional alternatives available; however, he should not go into the details because the jury should return a verdict based solely on the evidence, not on the possible penal ramifications, which is a matter left entirely to the trial judge. R. at 1078–79. Georgopulos seems to acknowledge that the prosecutor himself did not implant an erroneous view of the law in the minds of the jury. Rather, he complains the *voir dire* examination revealed that the "consequences of the verdicts offered were unclear to the jurors" and that the discourse between the jurors and counsel for both sides "revealed jurors' ignorance and misconception about applicable law." Brief of Appellant at 12. We assume without deciding that an erroneous impression of the law on this subject implanted in the minds of the jury, regardless of its source, entitles a defendant to a curative jury instruction. However, we disagree that the jury had such an impression in this case. Our review of the record shows little more than prospective jurors expressing their attitudes, concerns, and opinions about the insanity defense itself and not about potential post-trial dispositions.[2] In addition,

---

2. One prospective juror did state that she would not be able to serve on the panel if she were not informed of the possible sentencing consequences. R. at 1078–79, 1088. However, this juror did not serve because the trial court excused her for cause. R. at 1093.

the prospective jurors who expressed doubts about the insanity defense also indicated that the defense could be appropriate in some cases and, despite their attitudes, they could nevertheless follow the law. R. at 964, 965, 971, 973, 994, 1013, 1019, 1047, 1057. For this additional reason, the trial court did not err in refusing · to give Georgopulos' tendered final instruction.

■ Even though no error occurred in this case, we do acknowledge the potential for confusion in cases where the jury is faced with the option of finding a defendant not responsible by reason of insanity or guilty but mentally ill. Accordingly, in the exercise of our constitutional supervisory responsibilities, *see* Ind. Const. Art. 7, § 4, we adopt the following procedure for cases tried after the date this opinion is certified. When the verdict options before a jury include not responsible by reason of insanity or guilty but mentally ill, and the defendant requests a jury instruction on the penal consequences of these verdicts, the trial court is required to give an appropriate instruction or instructions as the case may be.[3]

## II.

■ The trial court sentenced Georgopulos to the maximum term of sixty-five years. Georgopulos challenges his sentence contending the trial court considered improper aggravating factors, did not explain why the factors were aggravating, and erroneously failed to consider mitigating factors. When enhancing a sentence, a trial court is required to state its specific reasons for doing so. Accordingly, the sentencing statement must: (1) identify significant aggravating and mitigating circumstances; (2) state the specific reason why each circumstance is aggravating or mitigating; and (3) demonstrate that the trial court balanced the aggravating and mitigating circumstances and determined that the aggravators outweighed the mitigators. *Battles v. State,* 688 N.E.2d 1230, 1235 (Ind.1997).

At sentencing the trial court engaged in an oral recitation setting forth the facts and circumstances of the offense generally identifying aggravating and mitigating circumstances. It is true that to facilitate appellate review, the better practice entails specifically enumerating aggravating and mitigating circumstances and detailing the basis for each. *Henson v. State,* 707 N.E.2d 792, 795 (Ind.1999). However, the trial court's narrative in this case is sufficient for us to conclude that it found the following aggravating factors: (1) the risk that Georgopulos would commit another crime; (2) a reduced sentence would depreciate the seriousness of the offense; (3) the nature and circumstances of the offense; and (4) the lack of remorse. As a mitigating factor, the trial court considered Georgopulos' lack of a criminal history.

**3.** Although not binding, the trial court may consider the following as appropriate instructions:

Whenever a defendant is found guilty but mentally ill at the time of the crime, the court shall sentence the defendant in the same manner as a defendant found guilty of the offense. At the Department of Correction, the defendant found guilty but mentally ill shall be further evaluated and treated as is psychiatrically indicated for his illness. *See* Ind.Code § 35–36–2–5.

Whenever a defendant is found not responsible by reason of insanity at the time of the crime, the prosecuting attorney shall file a written petition for mental health commitment with the court. The court shall hold a mental health commitment hearing at the earliest opportunity after the finding of not responsible by reason of insanity at the time of the crime, and the defendant shall be detained in custody until the completion of the hearing. If, upon the completion of the hearing, the court finds that the defendant is mentally ill and either dangerous or gravely disabled, then the court may order the defendant to be committed to an appropriate facility, or enter an outpatient treatment program of not more than ninety (90) days. *See* Ind.Code § 35–36–2–4; Ind.Code § 12–26–6–8.

█ The risk that the person will commit another crime is a statutory aggravating factor. *See* Ind.Code § 35–38–1–7.1(a)(1). In relying on this factor the trial court explained:

> [I] look at the planning and the manner of the execution of the victim in this case. That leads me to believe that the Defendant is a risk to the community for another murder of another woman. His jail sentence must be increased to protect our community and to punish the crime that he has committed.

R. at 2014. Although not a model of explicitness, the trial court's explanation is sufficient.[4] Further, contrary to Georgopulos' assertion, there is evidence in the record to support the trial court's explanation; therefore, the use of this aggravator was appropriate. As for the statutory aggravator that imposition of a reduced or suspended sentence would depreciate the seriousness of the crime, *see* Ind.Code § 35–38–1–7.1(b)(4), we have held that this factor cannot be used to justify an enhanced sentence unless the trial court was considering a reduced sentence. *Barany v. State,* 658 N.E.2d 60, 67 (Ind.1995). However, the record here supports the conclusion that the trial court may have been considering reducing Georgopulos' sentence from the presumptive.[5] Thus, the use of this aggravator was also appropriate.

█ Much of the trial court's narrative in this case focused on the heinous nature of the offense and the manner in which it was committed. Observing that the crime was "ruthless and brutal," the trial court highlighted the innocence of the victim, that she was unarmed and defenseless, the repeated attacks on the victim, and the mutilation of the victim while still alive. The trial court also observed:

> [T]he Defendant carefully planned this crime. He thought about it for a long time. He got a knife, he got a change of clothes, he got money for the get-away. He went through the routine of his day and then he went over to the show house where the victim would be at a certain time of the day he had planned. He waited to be sure that no one was around, he hid the knife in his pants and then he executed the murder. He carried it out almost to perfection.

R. at 2016. A trial court may consider the nature and circumstances of a crime to determine what sentence to impose. *See* Ind.Code § 35–38–1–7.1(a)(2); *Taylor v. State,* 695 N.E.2d 117, 120 (Ind.1998). Further, the manner in which a crime is committed can be considered as an aggravating circumstance. *Id.See also Sherwood v. State,* 702 N.E.2d 694, 700 (Ind. 1998) (heinous nature of crime proper aggravating factor). We find no error here.

---

4. The record shows that the trial court actually referred to the correctional or rehabilitative treatment aggravator. *See* Ind.Code § 35–38–1–7.1. For this aggravator to justify in part an enhanced sentenced, "it must be understood to mean that the defendant is in need of correctional and rehabilitative treatment that can best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term." *Mayberry v. State,* 670 N.E.2d 1262, 1271 (Ind.1996). Because the trial court made no attempt to articulate how correction or rehabilitation could be achieved through the imposition of an enhanced sentence rather than the presumptive sentence, we perceive the trial court's reference to this aggravator as inadvertent.

5. For example, the trial court indicated that it was "impressed with the amount of recommendations and statements about the defen-

dant," R. at 2012; that it had "reviewed ... the memorandum of the defense and also the letters that were found in the pre-sentence report....", R. at 2014; the court noted further, "I tried to eliminate from my mind the case itself and look at all the letters and the letters were numerous for Mr. Georgopulos. But after considering that, the requests that a lot of the letters had of reducing this to a 45 year sentence, the Court finds that the imposition of a reduced sentence would depreciate the seriousness of this crime." R. at 2015. It is true that the trial court's narrative could be read as simply a response to the letters and that the trial court never intended to reduce the sentence at all. It is equally true, however, that in context the narrative reflects a trial judge faced with a difficult case and pondering an appropriate sentence.

■ The trial court also considered Georgopulos' lack of remorse as an aggravating factor. Georgopulos contends the trial court erred in so doing because (a) at sentencing he apologized to the victim's family, and (b) he maintained his innocence throughout the trial. On this latter point we make two observations. First, it is not error for a trial court to consider as an aggravating factor the lack of remorse by a defendant who insists upon his innocence. *Bacher v. State*, 722 N.E.2d 799, 802 n. 6 (Ind.2000). Rather, the lack of remorse is regarded only as a modest aggravator. *Id.* Second, Georgopulos' claim of innocence is premised on his defense of insanity. That is, Georgopulos maintains that he was innocent because he did not appreciate the wrongfulness of his conduct due to his mental condition. Georgopulos confuses innocence with lack of guilt. The two are not the same. Innocence presupposes the defendant committed no crime. *See, e.g., Fortson v. State*, 269 Ind. 161, 171, 379 N.E.2d 147, 153 (1978) (observing that a defendant may demonstrate his innocence by showing that some other person committed the crime, instead of himself). On the other hand, the defense of insanity is an acknowledgement that the defendant committed the crime but that the defendant is not responsible for having committed it because of a mental disease or defect. *See* Ind.Code § 35–41–3–6. It is clear that Georgopulos did not maintain his innocence. Rather, he maintained that he was not guilty.

As for the apology given at the time of sentencing, apparently the trial court was not persuaded. Complimenting Georgopulos for his statement, the trial court observed that the facts of the case itself showed no remorse. The trial court pointed out that immediately after the attack Georgopulos was not sure if Schriner was dead. Nonetheless, he never called the police, the fire department, or the hospital–even anonymously; he sought no medical attention for her; he showed no remorse at the hotel; and he remained in a happy mood when told of Schriner's death.

R. at 2017. The trial court did not err in considering Georgopulos' lack of remorse as an aggravating factor.

Finally, Georgopulos contends the trial court did not consider the following mitigating factors: (1) the numerous letters written on his behalf; (2) the testimony of friends and relatives; (3) his statement of remorse; and (4) his cooperation with police by turning himself in and voluntarily giving a statement. Georgopulos is incorrect in his contention that the trial court did not consider factors one through three.

■ The trial court considered the factors, discussed them on the record at the sentencing hearing, and ultimately concluded that the aggravating factors outweighed the mitigating factors. Even if we were to view Georgopulos' contention as an argument that the trial court did not give factors one through three sufficient mitigating weight, he still cannot prevail. Although a finding of mitigating factors is well within the discretion of a trial court, a trial court is not obligated to weigh or credit the mitigating factors the way a defendant suggests they should be weighed or credited. *Shields v. State*, 699 N.E.2d 636, 639 (Ind.1998). Only when a trial court fails to find a mitigator that the record clearly supports does a reasonable belief arise that the mitigator was improperly overlooked. *Id.* at 639–40.

As for Georgopulos' cooperation with police, the record does not reveal that this factor was raised at sentencing. Thus, the trial court did not abuse its discretion in failing to consider it. *See Carter v. State*, 711 N.E.2d 835, 838–39 (Ind.1999) (no abuse of discretion in failing to consider evidence of defendant's low I.Q. where the issue was not raised at sentencing). However, even if the subject of Georgopulos' cooperation with police had been presented to the trial court, we are not convinced the trial court's sentencing decision would have been any different. In *Brewer v. State*, 646 N.E.2d 1382 (Ind.1995), we found a maximum sentence of sixty years

for murder to be unreasonable when the defendant had confessed to a crime after it had remained unsolved for fifteen years. *Id.* at 1386. Until the defendants' confession, police had not linked him or anyone else to the crime. For fifteen years the defendant had escaped punishment for a murder, and it was likely he could have continued avoiding punishment. Accordingly, we found that the trial court gave insufficient weight to a significant mitigating factor, namely: the defendant's confession. *Id.*

Here, by contrast, Georgopulos' blood was present on a towel found at the crime scene, and he had previously spoken to others about his interest in Schriner. It is highly unlikely that Schriner's murder would have remained unsolved for very long. Hence, assuming that Georgopulos' cooperation with police was entitled to some mitigating weight had this fact been presented to the trial court, it is unlikely that the sentencing decision would have been different.

 Only one aggravator is necessary for the trial court to impose an enhanced sentence. *Grund v. State,* 671 N.E.2d 411, 419 (Ind.1996). Here the trial court found four valid aggravating factors and one mitigating factor. We find that the trial court properly weighed the aggravating and mitigating factors in reaching its sentencing decision.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, J.J., concur.